## GEORGE R. GAITHER, JR., Assignee, *vs.* GEORGE W. SLACK et al.

### *Fraud—Voluntary Promise Not to Enforce Mortgage.*

A father made a voluntary conveyance of a farm to his son, taking from the latter a mortgage for about one-half of the value of the land. At the same time the son executed an agreement by which he covenanted to pay to his father the sum of thirty dollars annually during the latter's life. The father told his son that he did not intend to collect the mortgage, but would be satisfied with the payment of the interest thereon during his life. The mortgage was subsequently assigned to plaintiff, and as a defence against its foreclosure the son alleged that he had been induced to execute the same in consequence of his father's fraudulent representations. *Held,* that the mortgage was not executed in consequence of any false representation by the father, but was a condition of his gift freely accepted by the son; that the promise not to enforce the mortgage, even if made as alleged, being without consideration, was not binding, and was a mere expression of intention, and that the mortgage is enforceable in the hands of the assignee.

Appeal from a decree of the Circuit Court for Carroll County (ROBERTS, C. J.)

The cause was argued before McSHERRY, C. J., FOWLER, PAGE, BOYD and SCHMUCKER, JJ.

*George R. Gaither, Jr.*, appellant, *in propria persona.*

*Guy W. Steele*, for the appellees.

PAGE, J., delivered the opinion of the Court.

This proceeding was instituted by the appellant, assignee of Joseph Slack, to enforce a vendor's lien upon a farm in Carroll County.

It appears from the record, that on the eighteenth of March, 1891, a certain Joseph Slack sold and conveyed to his son, the appellee, the farm in question, for the consideration (as stated in the deed), " of natural love and affection which I, the said Joseph Slack, have and bear towards my son, as

also for the sum of two thousand five hundred dollars."
For two thousand dollars thereof the son gave to his
father his promissory note, payable in three years, and
to secure the payment thereof executed and delivered a
mortgage on the same farm ; copies of the note and mort-
gage are filed with the bill. As to the balance of the pur-
chase money (the same being $500), the parties entered
into a written agreement, wherein the details of the entire
transaction appear to be fully set forth. In that instrument,
after a recital of the facts, as we have given them substan-
tially, it was agreed and George Slack bound himself and
his representatives to pay to his father thirty dollars a year
as long as his father should live, "and no longer ;" and to
the faithful performance of this he bound himself in the
sum of five hundred dollars.

The defences set up by the appellee and his wife, as con-
tained in their answer, are, that the mortgage was "ob-
tained through and by means of fraud and false represen-
tations, held out, and made to George W. Slack by said
Joseph Slack ;" that the parties to the mortgage under-
stood that "it was simply a matter of form," and "simply
a security for the yearly payment of $120 to Joseph Slack
during his life ;" and that the real consideration was the
payment of that sum annually for that period, and the con-
veyance by George of his interest in another farm to his
brother. Their answer also contains an admission that a
default has been made in the interest due on the $2,000 ;
and that there is now due on that account two hundred and
ninety-seven dollars.

The main question for us, presented by the appeal, arises
upon the charge that the mortgage was obtained through
the false and fraudulent representations of the father ; and
this requires of us to examine with care all the evidence
that appears in the record.

At the time of these transactions Joseph Slack was sixty-
four years of age. He was a widower with two sons, the
appellee and William D. Slack, both of whom were con-

siderably over the age of twenty-one years.   He was about
to re-marry, and before doing so he was desirous of mak-
ing some provision for both of his sons.   He owned two
farms, one containing about ninety acres, and worth $3,600;
the other, one hundred and fifty acres, and worth $5,400.
These two places he proposed to divide between his two
sons.   Neither of them held any interest in either of the
places, and the statement that part of the consideration
the appellee gave for the farm that was conveyed to him
was the transfer of his interest in the other place to his
brother cannot be correct, because of the indisputable
fact that the appellee had no such interest.   From the face
of the papers in the record it would seem that the father
was not unmindful of the principle of equality in the be-
stowment of his gifts.   To William he conveyed the ninety-
acre tract, worth about $3,600; to George he conveyed
the other, and larger tract, worth over five thousand four
hundred dollars, but he charged the latter with the pay-
ment of $2,000, and an additional thirty dollars per annum
during his own life.   There is nothing requiring explana-
tion about any of these facts.   Indeed, so far from exciting
suspicion, it is almost impossible to believe, without the
most cogent evidence, that the father, while he was thus
donating, with apparently scrupulous fairness, property of
considerable value, and acting ostensibly for the sole bene-
fit of his sons, and so that no result could accrue to him-
self, other than the absolute deprivation of the title to both
farms, could have been meditating and executing a fraud
upon one of those sons.   What possible motive could so
actuate him?   Being the owner in fee of both farms he
was perfectly free to retain them for his own use, or donate
them or any part of them to his sons, upon any terms and
conditions that he chose to impose.   Why, therefore, at-
tempt to do by fraud the thing he was legally competent to
do without staining his hands?   Why resort to false rep-
resentations and fraud to bring about that which it was
perfectly competent to do openly and above board?   It is

not charged there was a mistake in the preparation of the papers by which the appellee has been deprived of a right that it was intended the papers should confer upon him. It is conceded the mortgage and the agreement contain everything that should be therein contained and nothing more, nor is it pretended that the appellee was in any manner misled as to the character of the papers that were executed. He knew that by the deed he acquired title to the farm, and that by the mortgage he was fastening a lien on it for $2,000.

The exact nature of the alleged fraud of the father is thus stated by the appellee in his evidence : He says, " he (father) gave me a deed for this property ; he wanted to hold something in the property, something, same as a life-estate, as he told me ; then he wanted to take a mortgage on it ; that Mr. Wadlow (the conveyancer), said it would be easier fixed in that way, but this mortgage was never to be collected, it was to be mine, that it was to revert to me ; I was to pay him a certain amount · a year, but this mortgage was never to be collected ; it was $150 per year I was to pay him as shown by the mortgage and agreement, $120 on the mortgage and $30 on the agreement, &c." In making this statement he is not corroborated by the statements of Mr. Wadlow or of his father, or, as we have seen, by any of the probabilities of the case. Both Mr. Wadlow and the father testify that there was no other contract than that shown by the agreement. Nor could the statement of the father, that he would not collect the principal sum, deceive him, even if it be conceded that the father then so intended and communicated his intention to his son. The entire transaction was voluntary, so far as the father was concerned. He made no promise that he would not collect it, and if he had made such a promise, having been made without consideration passing to him, it was *nudum pactum* and not binding upon him. The appellee, however, knew that it was only an intention, which could, at any time, be revoked by his father ; he knew that the mortgage was liable to be fore-

closed at the pleasure of his father when he accepted the deed for the property and executed the mortgage. He knew that he was receiving a gift from his father of over three thousand dollars beyond the burden he was required to carry. Perhaps the father, in fact, never did intend to collect the money ; he, in fact, told several persons that he did not ; and probably would never have done so, had his son paid him the interest thereon annually, as it became due. The very object in retaining the control over this sum was to secure himself against the default of his son. He said to Mrs Ninasah Slack, " I cannot give all my property away. I don't know what may happen to me, I may need something. I may become paralyzed or helpless." Events have demonstrated how wise he was in indulging in such reflections.

But the statement itself is not sufficient to affect the terms of the written agreements as contained in the deed, the mortgage and the agreement. In substance, it amounts to an averment on the part of his father that he did not intend to collect the mortgage except as to the interest, and that the principal fund would finally go to the appellee. It was not the misrepresentation of a fact, but merely of a purpose then in his mind, that he might or might not thereafter change ; such a statement, even if relied upon by the other party, is not sufficient to set aside solemn instruments, such as deeds or written agreements. " A false representation as to a matter of intention not amounting to a matter of fact, though it may have influenced a transaction, is not a fraud at law nor does it afford a ground for relief in equity." *Kerr on Fraud and Mistake,* page 88, and authorities there cited. It is true a representation as to intention may in fact amount to an engagement ; in such case it is enforced as a contract ; and when the misrepresentation of intention is made for the purpose of accomplishing a fraudulent result, as for instance where a person represents that he intends to pay for goods that he is buying, whereas in fact he intends to the contrary, it is a fraud. *Swift* v. *Rounds,* 19 R. I. 527 ; *Diggs* v. *Denny,* 86 Md. 129.

Here the representation as to the father's intention was not made to influence the son to execute the mortgage. The son was clearing some three thousand dollars by the transaction, and probably needed no special inducements to accept the gift.   Nor could the father have made it for a fraudulent purpose or with intent to induce the son to do an act to his prejudice.   It was a statement which, if actually made, was of that character to which " mere statements of opinion, judgment or expectation " belong ; one that " goes for naught " and upon which the party is not justified in placing reliance.   *Robertson* v. *Parks*, 76 Md. 132.

We are therefore of opinion that the fraud charged by the appellee has not been sustained by the proof.   The decree of the Court must be reversed and the cause remanded.

> *Decree reversed with costs and cause*
> *remanded for decree in conformity*
> *with this opinion.*

(Decided June 22nd, 1899).